# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICA MEYER, individually and as representative of the estate of JOHN MEYER, deceased, MATTHEW MEYER, JULIA MEYER, and JOSHUA MEYER,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **And** | ) ) | |
| **BRIDGESTONE AMERICAS TIRE OPERATIONS, INC.,** | ) ) ) | **Case No. 3:14-cv-01398** <br> **Judge Aleta A. Trauger** |
| **Intervening Plaintiff,** | ) ) ) | |
| **v.** | ) ) | |
| **TAPESWITCH CORPORATION,** | ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM

The plaintiffs in this case are Mica Meyer, individually and as representative of the estate of John Meyer, deceased, and the deceased's children, Matthew Meyer, Julia Meyer, and Joshua Meyer. They bring suit against defendant Tapeswitch Corporation ("Tapeswitch"), alleging that a safety mat manufactured by Tapeswitch malfunctioned, causing John Meyer's death.[1] Now before the court is Tapeswitch's Motion for Summary Judgment (Doc. No. 70). The motion has been fully briefed and is ripe for review. For the reasons set forth herein, the motion will be granted.

---

[1] The Complaint also asserts claims against Rowan Technologies, Inc., but the plaintiffs voluntarily dismissed their claims against Rowan Technologies under Rule 41(a)(i) of the Federal Rules of Civil Procedure on August 18, 2014. (*See* Doc. No. 15.)

## I.      LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that, as a matter of undisputed material fact, the plaintiff cannot establish at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Incident

The facts in this case are largely undisputed, as established by the plaintiff's Response to the Defendant's Statement of Undisputed Material Facts (Doc. No. 77) and the defendant's

Reply Statement to Plaintiff's Statement of Additional Material Facts (Doc. No. 83). The parties

disagree as to their interpretation of the facts.

John Meyer was employed as a tire-builder by intervenor plaintiff Bridgestone Americas

Tire Operations, Inc. ("Bridgestone") from 2010 until the date of the incident underlying this

lawsuit, July 12, 2013 ("Incident"). When the Incident occurred, Meyer was operating a tire

assembly machine ("TAM"), known as the "Charlie 1 TAM" or "C-1 TAM," at Bridgestone's

tire plant in LaVergne, Tennessee. The operator of the C-1 TAM controls the machine with foot

pedals and buttons. As explained by the Worksheet issued by the Tennessee Department of

Labor and Workforce Development, Division of Occupational Safety and Health:

> The Charlie 1 TAM builds truck tires out of small "sheets" of rubber that are put
> on in layers. There are 2 different stations on the machine that are used to build
> the tire. One of the stations consists of the builder drum, innerliner tray, and now-
> server. The tire is built around the drum, with the drum filling the "hole" of the
> tire. The drum allows the tire to be rotated as the operator applies the layers of
> rubber and adhesive. The innerliner tray is a small conveyor that brings the sheets
> of rubber down to the operator. The innerliner tray moves up and down on air
> cylinders. The now-server is a guide that helps the operator line up the sheets of
> rubber so that they go onto the tire straight. The now-server is attached to the
> innerliner tray, and is also operated with air cylinders. The operator stands
> directly in front of the drum to build the tire and cycle the machine with the foot
> pedals. The foot pedals are on the floor, directly below the outside edge of the
> drum.

(Doc. No. 70-1, at 1.)

The innerliner tray and the now-server assist the operator in applying additional layers of

rubber to the drum. (*Id.*) These components are pneumatically controlled and descend from

above the drum when the operator calls on the machine to "cycle." When they descend toward

the drum, the innerliner tray and now-server pose a safety hazard: "When the innerliner tray and

now-server are lowered into position, the space between the innerliner tray and drum is 5 inches

and the space between the now-server and the drum is 3 inches." (*Id.* at 1–2.)

In July 2013, Bridgestone used a ControlMat Safety Mat ("Mat") manufactured by Tapeswitch to prevent the innerliner tray from coming down on the tire-builder at any point in the process. As discussed in greater detail below, when the tire-builder stepped onto the Mat, the innerliner tray would ordinarily stop moving:

> When the operator gets to the step where the innerliner tray and now-server are needed, the operator calls for the cycle (with the foot pedal or the button on the control panel), and then walks away to get the layers of rubber (BEI's) that are needed for the next step. Even though the operator calls for the cycle, the machine will not cycle until the operator steps off of the safety mat. When the machine cycles, the innerliner tray lowers down and comes to a stop, and then the now-server flips over into position so that the operator can line up and apply the next layer of rubber to the tire.

(*Id.*)

On July 12, 2013, John Meyer was working at the C-1 TAM when he was caught in and crushed between the drum and the innerliner tray of the C-1 TAM. No one actually witnessed the Incident, and there were no security cameras facing the area where Meyer was working. Co-worker Brian Armstrong rushed to Meyer's machine as soon as he was alerted to the Incident. He found Meyer "laid over . . . the building drum, and the [innerliner] tray was on top of him." (Armstrong Dep. 8:15–20, Doc. No. 78-7, at 2.) Armstrong testified that the Mat appeared to be in its correct position when he found Meyer. Various witnesses testified that, when they first saw Meyer caught in the machine, his feet were off the floor by as little as a half inch or as much as three inches.

Because no one witnessed the Incident and Meyer's feet were off the ground when he was found, no one can say with absolute certainty whether his feet were on the Mat or whether, instead, he may have been standing on the railing above the C-1 TAM's foot pedals when the Incident occurred.

Meyer received aid from first responders on-site before being flown to Vanderbilt

Medical Center. However, as a result of the injuries sustained in this Incident, he died a week later.

### B.  The Safety Mat

Bridgestone purchased the Mat that is the subject of this litigation from Tapeswitch in May 2010, and it was delivered to Bridgestone on or about May 12, 2010. The plaintiff explains, and it is undisputed for purposes of the defendant's Motion for Summary Judgment, that the Mat is composed of eight switch elements that run the length of the Mat. Each switch element consists of two metal strips held apart by a plastic structure. The metal strips lie on top of one another and normally have a small space between them so that they are not in contact with each other. Two wires connect the top and bottom metal strips of one switch element to the corresponding metal strips of the next element, and the Mat is then electrically connected to a manufacturing machine. The Mat is designed so that, when an operator stands on it, the metal strips are compressed, closing the electrical circuit and causing the machine to which the Mat is connected to stop operation. (Compl. ¶¶ 13–15.)

It is the plaintiff's position that the Mat malfunctioned while Meyer was working at the C-1 TAM, such that the machine did not shut off as it was supposed to do when Meyer stepped on the Mat. The Steelworkers Union conducted an investigation on July 15, 2013, a few days after the Incident, and concluded that the Mat did not function properly. Subsequent testing by the plaintiffs' expert in March 2016 confirmed that the Mat was not functioning properly. (Galler Report, Doc. No. 70-7, at 3.) Tapeswitch concedes, for purposes of its motion, that there is a disputed issue of fact as to whether several of the switch elements were malfunctioning at the time of Meyer's death, due to poorly soldered joints between the wires and the switch elements. According to the plaintiffs' expert, "small improvements in the soldering methods would have

prevented joint failure." (*Id.* at 9.)

It is also undisputed, however, that the Mat should have been, but was not, connected to the C-1 TAM through a safety controller. Tapeswitch provided a shipping tag with the Mat at the time it was delivered to Bridgestone. (Doc. No. 70-5.) The shipping tag included a "Recommended Wiring Diagram" for a "Fail-Safe Supervised Circuit Concept" and an instruction to "[i]nterface this sensor to your machine with [a] Tapeswitch controller[]." (*Id.*)

Tapeswitch also provided an Installation Manual with the mat. The Installation Manual had a warning in a box on its cover that instructs the installer to read all the instructions contained in the manual and to "correctly fit[]" the Mat to a "suitable machine":

> **WARNING**
>
> Tapeswitch safety mat systems are intended to detect operators working at or near dangerous machinery and to send a signal to the safety control system. They can only perform this function if they are correctly fitted to a suitable machine. It is essential that the full contents of this manual and all the authoritative documents referred to herein are fully understood before any attempt at installation is made. If in doubt, contact Tapeswitch Corporation.

(Installation Manual, Doc. No. 70-6, at 1.)

The Installation Manual also incorporated additional warnings at several points within the text, specifically instructing the purchaser of the Mat to install it with a safety controller. For example, a warning in a box in the Introduction section of the Manual states:

> **NOTE**
>
> ControlMat Safety Mats . . . do not by themselves constitute a complete safety system. **The user must also select a safety interface controller/safety interface module (SIM) that complies with annex B of ISO 13849-1 (EN954-1) and the guidelines in ANSI B11.19.**
>
> The controller must include duel channel monitoring such that a single electrical failure in the mat, interconnecting wiring, or the control unit itself will be detected and will shut down the machine.
>
> This will establish a complete safety machine interface system. . . .

(*Id.* at 3 (emphasis in original).) A notice in the Installation section of the Manual, again in a box to set it apart from the other text on the page, provides:

> *WARNING: The Tapeswitch ControlMat is designed to protect operators working at or near dangerous machines. It can only perform that function if it is correctly installed and interfaced to a suitable machine controller or Safety Interface Module (SIM).*

(*Id.* at 7 (emphasis and italics in original).)

Tapeswitch's corporate representative, Patrick Falbo, testified that a safety controller is designed to work so that, if any component of a safety mat or the controller is malfunctioning, "even if it's a screw loose on the controller," the safety controller will render the machine to which it is connected inoperable. (Falbo Dep. 191:17–21, Doc. No. 70-4, at 7.) Although Bridgestone had another Tapeswitch mat at the LaVergne plant that was connected with a safety controller, the Mat at the C-1 TAM at which Meyer was working was not installed with a safety controller. Bridgestone's corporate representative, Danny Wright, testified that the Mat was "not installed according to the manual," that the failure to install the Mat with a safety controller in accordance with the manual's instructions was "inappropriate," and that "[t]ypical installation of safety mat [sic] would include a safety controller of some sort, whether it be Tapeswitch brand or

some other brand of safety controller." (Wright Dep. 43:8–11, 70:11–14, Doc. No. 70-8, at 2, 4.)

Instead of installing a safety controller, Bridgestone had "twisted two wires together out of the four on one conductor and two wires together out of the four on the second conductor, and then . . . hot-wired it to a two-wire cable so that it . . . could no longer be a safety switch." (Falbo Dep. 176:21–177:2, Doc. No. 70-4, at 5–6.) The plaintiffs' expert conceded that the absence of a safety controller meant that there was no device to sense whether the Mat's circuits were malfunctioning. (Galler Dep. 111, Doc. No. 70-9, at 2.)

### C.     The Lawsuit

The plaintiffs filed their Complaint against Tapeswitch in this court on June 30, 2014, asserting state-law claims over which the court has diversity jurisdiction. The plaintiffs assert claims of negligence (Count 1) and strict products liability (Count 2), based on allegations that the defendant manufactured, assembled, marketed, and sold a safety mat that they knew, or should have known, was defective and unreasonably dangerous at the time it left the defendant's control and failed to adequately warn the user of the Mat that its components could become inoperable, rendering the Mat ineffective with respect to its intended use. They also assert a claim of breach of express and implied warranties (Count 3). Tapeswitch answered, denying liability and asserting numerous affirmative defenses, including statute of limitations, comparative fault, misuse of its product, and failure to follow proper instructions and warnings.

In June 2015, Bridgestone was granted permission to file an Intervening Petition, asserting a subrogation lien on all compensation benefits Bridgestone paid to John Meyer or his health care providers in the wake of the accident and Meyer's subsequent death, under Tenn. Code Ann. § 50-6-112.

Upon the conclusion of discovery, Tapeswitch filed its Motion for Summary Judgment

(Doc. No. 70), Statement of Undisputed Material Facts (Doc. No. 71), supporting Memorandum (Doc. No. 72), and various deposition excerpts and exhibits. In response, the plaintiffs filed their Opposition to the Motion for Summary Judgment (Doc. No. 76), Response to Tapeswitch's Statement of Undisputed Material Facts (Doc. No. 77), which also incorporates their Statement of Additional Material Facts, and their own deposition excerpts. The defendant filed a Reply Statement to the plaintiffs' Statement of Additional Material Facts (Doc. No. 83) and a Reply (Doc. No. 82), with yet more deposition excerpts. The Motion for Summary Judgment has been fully briefed and is ripe for review.

## IIII.  ANALYSIS

Tapeswitch's motion seeks judgment in its favor as to all claims asserted against it. First, with regard to the breach-of-warranty claims, Tapeswitch maintains that Tennessee's four-year statute of limitations pertaining to warranties began to run in May 2010, the date Bridgestone accepted delivery of the Mat. The plaintiffs did not file suit until June 2014, more than four years later. Tapeswitch argues that the claim is therefore barred by the statute of limitations. The plaintiffs' Opposition does not address this argument, and the court finds, as a matter of law, that the breach-of-warranty claim is time-barred. *Accord* Tenn. Code Ann. § 47-2-725(2) ("A cause of action [under this section] accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made . . . ."); Tenn. Code Ann. § 47-2-725(1) (establishing four-year limitations period for breach of any sales contract); *Commercial Truck & Trailer Sales, Inc. v. McCampbell*, 580 S.W.2d 765, 773 (Tenn. 1979) ("It is well settled in this jurisdiction that in actions for personal injury . . . resulting from breach of warranty, the four-year statute provided in [Tenn. Code Ann. §] 47-2-725 controls."). The court will therefore grant summary judgment in favor of the defendant on the

breach-of-warranty claim without further discussion.

Tapeswitch asserts that, because the remaining claims are governed by the Tennessee Products Liability Act of 1978 ("TPLA"), Tenn. Code Ann. § 29-28-101 *et seq.*, the plaintiffs cannot recover under any theory unless (1) the Mat is "determined to be in a defective condition or unreasonably dangerous at the time it left" Tapeswitch's control, Tenn. Code Ann. § 29-28-104(a), and (2) the decedent's injury was proximately caused by the defective product. *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Tapeswitch argues that it is entitled to summary judgment because the facts, even viewed in the light most favorable to the plaintiffs, do not establish the existence of either a manufacturing defect or causation. Tapeswitch further argues that the plaintiffs' failure-to-warn claim, encompassed by the negligence claim, fails as a matter of law because Tapeswitch included clear warnings with the Mat that were neither heeded by Bridgestone nor passed along to John Meyer.

In response, the plaintiffs argue that material factual disputes preclude judgment as a matter of law as to the existence of a defective product or a causal connection between the defect and the injuries suffered by John Meyer and as to the adequacy of the warnings provided by Tapeswitch.

The court concludes, as discussed below, that the Motion for Summary Judgment as to the plaintiff's products liability claims should be granted on the basis that the Mat, but for Bridgestone's improper installation, was not unreasonably dangerous and that the warnings provided by Tapeswitch were adequate as a matter of law.

**A.      The TPLA**

All of the plaintiffs' remaining claims are clearly governed by the TPLA. Under this

statutory scheme, a product liability action "includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product," whether the case proceeds under a theory of "strict liability in tort; negligence; [and/or] breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent." Tenn. Code Ann. § 29-28-102(6).

Generally, to establish a *prima facie* products-liability claim under the TPLA, the plaintiff must show that: "(1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *King v. Danek Med.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000)); *see also* Tenn. Code Ann. § 29-28-105(a) ("A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.").

The statute defines "defective condition" as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). A product is "unreasonably dangerous" if it is

> dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8).

Further, however, "[i]f a product is not unreasonably dangerous at the time it leaves the

control of the manufacturer or seller but was made unreasonably dangerous by subsequent unforeseeable alteration, change, improper maintenance or abnormal use, the manufacturer or seller is not liable." Tenn. Code Ann. § 29-28-108.

**B.     Whether the Mat Was Defective or Unreasonably Dangerous**

Tapeswitch argues, first, that, even accepting as true the plaintiffs' expert's testimony about soldering defects in its construction, the Mat was neither in a "defective condition" nor "unreasonably dangerous" at the time Tapeswitch sold it to Bridgestone. Tapeswitch argues that the Mat was "completely safe for normal or anticipatable handling," because Tapeswitch designed the Mat to be used with a controller interface and warned Bridgestone that the Mat did "not constitute a complete safety system" unless it was properly installed with a controller. It argues that, if Bridgestone had properly installed the Mat with a controller in accordance with the instructions set forth in the Installation Manual, "the Mat would have been totally safe for Mr. Meyer and every other user even if the alleged solder defect had broken the electrical circuit." (Doc. No. 72, at 11.)

In response, the plaintiffs argue that, even if a controller would have detected a fault in the Mat, the solder defects still exist, rendering the Mat defective and unreasonably dangerous. They point out that the Mat was not shipped with a controller and assert that, as a result, the Mat was unreasonably dangerous as shipped. Finally, they argue that, to the extent Tapeswitch is attempting to argue that Bridgestone was negligent in installing the Mat without a controller, the question of whether Bridgestone's negligence was the intervening cause of John Meyer's death is a factually intensive question that must be reserved for the jury. (Doc. No. 76, at 6 (citing *Poole v. Lowe's Home Centers, LLC*, No. 3:14-CV-01884 2016 WL 7180148 (M.D. Tenn. December 9, 2016)).)

In its Reply, Tapeswitch addresses the plaintiffs' argument that the Mat should have been shipped with a controller by arguing that the plaintiffs have no expert evidence to support that theory. It also contends that the plaintiffs have conflated the issues of whether the product was defective and whether that defect caused John Meyer's injuries.

The TPLA expressly provides two tests for determining whether a product is "unreasonably dangerous." Tenn. Code Ann. § 29-28-102(8). First, under the "consumer expectation test," a plaintiff must simply show "that the product's performance was below reasonable minimum safety expectations of the ordinary consumer having ordinary, 'common' knowledge as to its characteristics." *Sigler*, 532 F.3d at 484 (quoting *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001)). The second test is the "prudent manufacturer test," which, unlike the consumer-expectation test, requires "expert testimony about the prudence of the decision to market" the product. *Id.* at 484 n.7 (quoting *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527, 531 (Tenn. 1996)).

The court, first, rejects Tapeswitch's argument that, because "there is no evidence in the record . . . that ordinary consumers have knowledge about whether control mats should be or are sold with safety controllers," the plaintiffs are required to prove their claim using the prudent-manufacturer test, rather than the consumer-expectation test. (Doc. No. 82, at 3.) Tapeswitch suggests that, because the plaintiffs offer no expert evidence on this topic, the claim fails as a matter of law. To the contrary, the Tennessee Supreme Court has held unequivocally that the TPLA "permit[s] application of the consumer expectation test in all products liability cases in which a party intends to establish that a product is unreasonably dangerous." *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 804 (Tenn. 2001). The court acknowledged that a plaintiff's success under that test would ultimately "depend on whether the trier of fact agrees that the

plaintiff's expectation of product performance constituted the reasonable expectation of the ordinary consumer having ordinary knowledge of the product's characteristics." *Id.*

Thus, the question here is whether the plaintiffs can show that the Mat's "performance was below reasonable minimum safety expectations of the ordinary consumer having ordinary, 'common' knowledge as to its characteristics." *Sigler*, 532 F.3d at 484. Although "the general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury," *id.* (quoting *Jackson*, 60 S.W.3d 800, 805, 806 (Tenn. 2001)), Tennessee law also provides that a manufacturer is not liable for injuries caused by a product that "is not unreasonably dangerous at the time it leaves the control of the manufacturer or seller" but becomes unreasonably dangerous as the result of an unforeseeable or abnormal use by the purchaser. Tenn. Code Ann. § 29-28-108.

Here, Tapeswitch concedes for purposes of its motion that there is a material factual dispute as to whether the Mat had soldering defects in some of the electrical connections that might have led to its malfunctioning. It is also undisputed, however, that the Mat was intended to be used with a safety controller and was wired to be connected directly to a safety installer and not to a piece of manufacturing machinery. There is no dispute that Bridgestone, through its employees, disregarded the instructions and warnings that accompanied the Mat and altered its wiring in order to connect it directly to the C-1 TAM. As Tapeswitch's corporate representative explained, Bridgestone "twisted two wires together out of the four on one conductor and two wires together out of the four on the second conductor, and then . . . hot-wired it to a two-wire cable so that it . . . could no longer be a safety switch." (Falbo Dep. 176:21–177:2, Doc. No. 70-4, at 5–6.) Bridgestone acknowledged that installing the Mat without a safety controller in contravention of the installation instructions was "inappropriate" and that "[t]ypical installation

of safety mat [sic] would include a safety controller of some sort, whether it be Tapeswitch brand or some other brand of safety controller." (Wright Dep. 43:8–11, 70:11–14, Doc. No. 70-8, at 2, 4.)

The fact that the Mat was not sold with a controller is immaterial, in light of the fact that the Mat was clearly designed to be installed with a controller and that the instructions for installation only show how to install it with a controller. Moreover, the only evidence in the record on this issue establishes that "everyone in the industry" sells safety mats and controllers separately, because a purchaser "might need a new mat, but . . . might not need a new controller, or vice versa." (Falbo Dep. 178:22–179:2, Doc. No. 82-1, at 4–5.) Patrick Falbo also explained that the separate sale of safety mats and controllers facilitates the use of many different types of controllers—some panel mounted, some wall mounted, some that operate on a 120-volt input, and some on a 240-volt input, and so forth. (Falbo Dep. 111:21–112:8, Doc. No. 82-1, at 2–3.)

Finally, it is undisputed that, if the Mat had been attached to the C-1 TAM through a controller interface, any breakdown in the circuits of the Mat would have been detected by the controller, and the controller would have overridden the operation of the Mat to shut down the TAM. (*See, e.g.*, Galler Dep. 111:10–12, 18–21, Doc. No. 70-9, at 2 (stating "a single failure of a joint, any one joint, would have made the controller stop the machine operation" and agreeing that "[t]he way Bridgestone had the mat installed, the single failure would not have been detected").)[2] In other words, if the Mat had been properly installed in accordance with its intended use, it would not have been unreasonably dangerous. Bridgestone's alteration and

---

[2] The plaintiffs insist that "Tapeswitch's certainty that the controller would have worked properly is curious in light of the defects in its mat." (Doc. No. 76, at 6.) Their speculation that a safety controller might also have malfunctioned is simply that—speculation. Regardless, the evidence in the record indicates that, even if the controller itself malfunctioned, the effect would have been to shut down the TAM.

abnormal use of the Mat, rather than the alleged soldering defects, rendered it unreasonably dangerous. Tenn. Code Ann. § 29-28-108. On this basis alone, Tapeswitch is entitled to judgment in its favor on the plaintiffs' products liability claim, regardless of whether there were soldering defects in the Mat and regardless of whether John Meyer was actually standing on the Mat at the time of the Incident.

The court also finds, in the alternative, that, even assuming the Mat was defective or unreasonably dangerous at the time it left the manufacturer's control, the employer's intervening negligence in failing to install the Mat in accordance with the safety instructions provided with the Mat was "totally sufficient to cause [the plaintiff's] injuries without any other causative factors," that is, that Bridgestone's actions were the "sole" cause in fact of the injury. *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 150 (Tenn. 2007). For this reason too, Tapeswitch is entitled to judgment in its favor on this claim.

## C.     Failure to Warn

The TPLA recognizes a stand-alone cause of action based on failure to warn, "whether negligent or innocent." Tenn. Code Ann. § 29-28-102(6); *Long v. Quad Power Prods., LLC*, No. E2013-02708-COA-R3-CV, 2015 WL 1306872, at *4 (Tenn. Ct. App. March 20, 2015). *See also Rodriguez v. Stryker Corp.*, 680 F.3d 568, 570 (6th Cir. 2012) ("Under Tennessee law, a manufacturer must warn users about non-obvious dangers caused by its product."). There is effectively no difference between a negligent and an innocent failure to warn in terms of the plaintiff's elements of proof. *See Whitehead v. Dycho Co.*, 775 S.W.2d 593, 596 (Tenn. 1989) ("When the adequacy of such a warning is to be judged, whether under strict liability, negligence or breach of warranty, the standard of reasonable care is to be applied." (citation omitted)). In either event, to succeed on a failure to warn claim in the products liability context, the plaintiff

must establish both that the defendant breached a duty to provide an adequate warning, *see Evridge v. Am Honda Motor Co.*, 685 S.W.2d 632, 636–37 (Tenn. 1985), and that the failure to provide adequate warnings was both the cause in fact and proximate cause of the plaintiff's injury. *Long*, 2015 WL 1306872, at *7.

### 1.    *The Adequacy of the Warning*

The plaintiffs allege that Tapeswitch is liable for "[f]ailing to adequately instruct the user of the safety mat how to determine if the mat was wholly and/or partially inoperable" and "[f]ailing to adequately warn the user of the safety mat that the parts and/or components of the safety mat could become inoperable, rendering the safety mat ineffective with respect to its intended use." (Compl. ¶¶ 21(d) and 21(h).) Tapeswitch argues that it gave adequate warnings for proper installation and that, had Bridgestone heeded those warnings, the Mat would have been safe to use. It also argues that Tennessee courts have adopted Comment j to Section 402A of the Restatement (Second) of Torts, which states that, "where a warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." (Doc. No. 72, at 11 (quoting Restatement (Second) of Torts, § 402A, cmt. j).)

In fact, the Tennessee Supreme Court has expressly recognized that the quoted Comment is "in reality meaningless." *Evridge*, 685 S.W.2d at 636 (quoting J. Beasley, Products Liability and the Unreasonably Dangerous Requirement 439 (1981) ("J. Beasley")). The *Evridge* court agreed that "adequate warnings can be relied upon by a manufacturer or seller to escape liability for failure to warn of non-obvious dangers associated with a product." *Id.* However, it concluded that, "[i]f an adequate warning is given, there is no liability for failing to provide an adequate warning, and it hardly matters whether that adequate warning was read and heeded." *Id.* (quoting

J. Beasley).

"An adequate warning is one calculated to bring home to a reasonably prudent user of the product the nature and the extent of the danger involved in using the product. . . . The adequacy of the warning is a question for the jury unless reasonable minds could agree on the outcome." *Id.* at 636–37 (internal quotation marks and citations omitted). In the context of pharmaceuticals and medical devices, the Tennessee Supreme Court has provided a non-exclusive list of criteria to be considered in assessing the adequacy of a warning:

> 1. the warning must adequately indicate the scope of the danger; 2. the warning must reasonably communicate the extent or seriousness of the harm that could result from misuse of the drug; 3. the physical aspects of the warning must be adequate to alert a reasonably prudent person to the danger; 4. a simple directive warning may be inadequate when it fails to indicate the consequences that might result from failure to follow it and, . . . 5. the means to convey the warning must be adequate.

*Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn. 1994) (the "*Pittman* factors).[3]

The plaintiffs argue that the warnings provided by Tapeswitch in the Installation Manual were not adequate, because they "read much like marketing materials that encourage customers to purchase enhanced safety options" (Doc. No. 76, at 7) and did not clearly state that the product was unreasonably dangerous unless used with a controller and should under no circumstances be used without a controller.

The court disagrees. As set forth above, the Installation Manual included at least two prominent boxed warnings that the Mat should be installed with a safety controller:

---

[3] The Tennessee Supreme Court does not appear to have applied these factors outside the context of medications and medical devices, but the Sixth Circuit has. *See, e.g.*, *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 211–12 (6th Cir. 2015) (applying *Pittman* in a failure-to-warn case involving ratchet straps used in conjunction with a hunting treestand); *Barnes v. Kerr Corp.*, 418 F.3d 583, 590 (6th Cir. 2005) (applying *Pittman* in a case brought by a dentist alleging failure to warn of the dangers associated with working with dental amalgams containing mercury).

> **NOTE**
>
> ControlMat Safety Mats . . . do not by themselves constitute a complete safety system. **The user must also select a safety interface controller/safety interface module (SIM) that complies with annex B of ISO 13849-1 (EN954-1) and the guidelines in ANSI B11.19.**
>
> The controller must include duel channel monitoring such that a single electrical failure in the mat, interconnecting wiring, or the control unit itself will be detected and will shut down the machine.
>
> This will establish a complete safety machine interface system. . . .

(*Id.* at 3 (emphasis in original).)

> *WARNING: The Tapeswitch ControlMat is designed to protect operators working at or near dangerous machines. It can only perform that function if it is correctly installed and interfaced to a suitable machine controller or Safety Interface Module (SIM).*

(*Id.* at 7 (emphasis and italics in original).)

These warnings are quite specific that failure to install the Mat with a controller can make the Mat unsafe when used with dangerous machinery. The court finds that reasonable minds could not differ as to the adequacy of these warnings. Regarding the first and second *Pittman* factors, the warnings clearly identify the scope of the danger and seriousness of the harm, which would be commensurate with the danger posed by whatever piece of machinery is connected to the Mat. As to whether the physical aspects and means of conveying the warning were adequate, it is undisputed that, in addition to the Installation Manual, which provided detailed instructions for interfacing the Mat with a safety controller, the Mat came with a shipping tag attached to it that showed a "Recommended Wiring Diagram" for a "Fail-Safe Supervised Circuit Concept" and an instruction to "[i]nterface this sensor to your machine with [a] Tapeswitch controller[]."(Doc. No. 70-5.) It is difficult to imagine in what other form the warnings in this instance could have been communicated. *Accord Barnes*, 418 F.3d at 591 (finding that

"[r]easonable minds . . . could not differ as to the sufficiency of the warnings" given to the plaintiff); *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1426 (E.D. Tenn. 1991) (finding no question of fact on the issue of adequacy of warnings where the victim's mother testified that "[a]ny normal human knows" that cigarette lighters are dangerous for children), *aff'd sub nom. Curtis v. Pope & Talbot, Inc.*, 966 F.2d 1451 (Table), 1992 WL 138436 (6th Cir. 1992).

The defendant is therefore also entitled to summary judgment on the plaintiffs' failure-to-warn claim based on the adequacy of the warnings provided. Because Tapeswitch did not breach its duty to provide an adequate warning, the court does not reach the question of causation.

## IV.  CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted, and all other pending motions will be denied as moot.

An appropriate Order is filed herewith.

ENTER this 16th day of November 2017.

_____
ALETA A. TRAUGER
United States District Judge